UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————— x

CITY OF BIRMINGHAM RETIREMENT
AND RELIEF SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                              Plaintiff,

       vs.

VIRTU FINANCIAL, INC., DOUGLAS
CIFU, JOSEPH MOLLUSO, ALEX IOFFE,
and SEAN GALVIN,

                           Defendants.

——————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. _____

CLASS ACTION

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

Plaintiff City of Birmingham Retirement and Relief System ("Plaintiff"), on behalf of itself and all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by Virtu Financial, Inc. ("Virtu" or the "Company"), Company press releases and earning calls, analyst and media reports about the Company, and the complaint filed in *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, No. 1:23-cv-08072 (S.D.N.Y.). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons, other than Defendants (defined below), who purchased or otherwise acquired Virtu Class A common stock between November 7, 2018 and September 12, 2023, inclusive (the "Class Period"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events or omissions giving rise to the claims asserted herein occurred in substantial part in this District. Moreover, Virtu Class A common stock trades on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Virtu Class A common stock located across the United States, some of whom likely reside in this Judicial District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of the national securities markets.

**THE PARTIES**

6.      Plaintiff City of Birmingham Retirement and Relief System is a public pension system organized for current and former employees of the City of Birmingham, Alabama. Plaintiff manages over $1 billion in assets for the benefit of over 7,000 members. During the Class Period, Plaintiff purchased Virtu Class A common stock, as set forth in the attached certification, and was damaged thereby.

7.      Defendant Virtu is a global financial services firm and market maker, headquartered in New York. Virtu leverages its technology to provide liquidity, execution services and data, analytics, and other products to its clients. Virtu Class A common stock trades on the NASDAQ under the ticker "VIRT."

8.      Defendant Douglas Cifu ("Cifu") has served as Virtu's Chief Executive Officer since November 2013. Cifu previously served as Virtu's President and Chief Operating Officer and has served on its board of directors or the boards of its predecessors since co-founding the firm in April 2008.

9.      Defendant Joseph Molluso ("Molluso") has served as Virtu's Co-President and Co-Chief Operating Officer since May 2020.  Molluso joined Virtu in November 2013 as Chief Financial Officer and served in that role until a brief departure from Virtu, beginning in September 2019.

10.     Defendant Alex Ioffe ("Ioffe") served as Virtu's Chief Financial Officer from September 2019 – August 2020.

11.     Defendant Sean P. Galvin ("Galvin") has served as Virtu's Chief Financial Officer since August 2020.  Galvin previously served as the Chief Financial Officer of KCG Holdings, Inc. ("KCG"), which, as described below, was acquired by Virtu in June 2017.

12.     Defendants referenced above in ¶¶8-11 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "Defendants."

13.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's

operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. During the time they were employed by the Company, each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

16. Co-founded in 2008 by defendant Cifu and Vincent Viola, Virtu, together with its subsidiaries, is a global financial firm that uses its self-described "cutting-edge technology" to provide a variety of financial services and products in markets around the world.

17. Prior to mid-2017, Virtu operated as a single reportable business segment. Nearly all of its revenue came from its Market Making business, in which it makes markets in the cash, futures, and options markets across global equities, fixed income, currencies, cryptocurrencies, and commodities. Virtu's Market Making segment generates revenue buying and selling large volumes of securities and other financial instruments while earning small bid/ask spreads.

18.    In July 2017, Virtu acquired KCG, which owned a broker-dealer firm with a large trade execution business.  Before that time, Virtu did not have a significant trade execution business of its own.  After Virtu acquired KCG, it formed Virtu Americas, LLC ("VAM"), an SEC registered broker-dealer, which operated the customer-facing trade execution business acquired from KCG.  Through VAM, Virtu now purchased and sold orders for large institutional customers.

19.    As a result of the acquisition of KCG, the Company added a second reportable segment, Execution Services.  Through its Execution Services business, Virtu offers agency-based, execution-only trading, whereby the Company utilizes its technology to execute trades for some of the largest institutional investors in the world, including mutual funds, pension plans, plan sponsors, hedge funds, and trusts and endowments, earning a commission.  Other of Virtu's Execution Services clients include global, national and regional broker dealers and banks in North America, Europe and Asia.

20.    Virtu then further increased the size of its Execution Services segment with the acquisition, announced in November 2018 and finalized in March 2019, of broker-dealer Investment Technology Group, Inc. ("ITG").

21.    Accordingly, during the Class Period, Virtu operated, *inter alia*, a proprietary trading business, in which Virtu bought and sold securities in its own account and for its own benefit, as well as a trade execution business, executing buy or sell orders for customers, including large institutional investors.

22.    No later than January 2018, VAM began storing extremely sensitive customer trade execution details, including trading information generated from VAM's customer orders, in a database that also continued to hold Virtu's legacy proprietary trading data.  The trading information

in VAM's primary database for daily business operations, as well as a backup database (together, the "FS Database") consisted of, among other things, the following:

- specific customer-identifying information;

- the name of the security;

- the side of the transaction (buy or sell);

- the execution price;

- the execution volume; and

- the trading algorithm used for each order.

23.     Notwithstanding the highly sensitive nature of this information, during the Class Period, Virtu failed to implement effective information access barriers to protect it.  From at least January 2018 through April 2019, *anyone* at Virtu, including proprietary traders at both VAM and its affiliates – who were supposed to be walled off from accessing such information – could directly access the FS Database and its material, nonpublic information, using a widely known and shared generic username and password.  Moreover, Virtu was unable to monitor which employees accessed the FS Database, or what information they viewed.

24.     As of November 2018, the main FS Database could be accessed simultaneously by 75 users using direct access.  As a direct result of complaints by Virtu traders about the database's capacity limits, the user limit was *increased* to 125 later that month.

25.     Despite being aware that essentially all Virtu employees – including its proprietary traders – had unfettered access to Execution Services customers' material non-public trading information, Virtu continued to allow direct access to such information in the FS Database with generic login credentials, until at least April 2019.

26.     The detailed – and nonpublic – information contained in Virtu's FS Database would be extremely valuable to a proprietary trader because it, among other things, provided a direct

- 6 -

window into how Virtu's large institutional clients were trading, or planned to trade, in which securities, and in what precise amounts.

27.     The vast amount of information Virtu left unprotected could easily be abused by its proprietary traders through, among other things, knowing a customer planned to make large trades in a particular security and then executing a trade in that security for Virtu's own benefit ahead of that customer's transactions.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

28.     The Class Period begins on November 7, 2018, when Virtu announced its plans to acquire ITG, a broker-dealer that executed trades for more than 1,000 firms, including mutual, pension and hedge funds.

29.     The same day, the SEC issued, against ITG and an affiliate, an Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, in connection with ITG's failure to establish adequate safeguards and procedures to protect certain confidential trading information. ITG agreed to pay a civil penalty of $12 million to settle the charges.

30.     On Virtu's 3Q18 earnings call held the same day, defendant Cifu, in his prepared remarks, discussed Virtu's protection of sensitive client information, in pertinent part, as follows:

> Turning to Slide 6.  You see the importance we place on protecting client information in all aspect of our business.  We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.  Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind.  These safeguards include physical separation, logical access control and entitlement reviews.  Clients have entrusted their most sensitive confidential information to ITG in POSIT, in Triton, in the analytics segment. Rest assured that we will be vigilant in protecting that information.  We will build on the existing safeguards ITG has

employed and ensure that going forward, there continues to be physical and logical separation, monitoring, testing and training.

Let's discuss the analytics or POSIT Alert businesses, for example. They will be located in separate physical spaces. Access will be restricted by keycard to only authorized and personnel and monitor. Technology controls will restrict logical access. Personnel will be trained to ensure adherence. In addition to monitoring and testing our safeguards and policies through internal audits, we are also looking to contract an external independent auditing firm to regularly review the effectiveness of our controls. In addition to these safeguards, Virtu is a firm believer in using technology to enhance transparency to end customer. Our tools provide the ability for institutions to have unprecedented visibility into the complete life cycles of their orders. That includes importantly why their orders were routed, not just that they were routed.

31.     The statements referenced above in ¶30 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)     that detailed confidential trading information from Virtu's Execution Services customers was accessible to essentially everyone at the Company via a widely known and regularly shared generic username and password, including to proprietary traders, who could abuse and benefit from that information;

(b)     that Virtu was unable to monitor which of its employees logged into the FS Database, or what information was viewed;

(c)     that, as a direct result of complaints by Virtu's traders about the FS Database's capacity limits, Virtu increased the number of users who could have simultaneous access;

(d)     that Virtu failed to take reasonable steps to prevent or even detect dissemination or abuse of this trading information; and

(e)     that Virtu's policies and procedures were inadequate to prevent unauthorized use of trading information from Virtu's Execution Services customers.

32.    Accompanying the conference call was a slide deck.  On page 6 of the presentation, referenced by defendant Cifu in the remarks quoted above in ¶30, the Company touted its "***existing*** safeguards to protect client information," including "physical and logical safeguards of client information" between different areas of Virtu's business and "[r]eview of approved personnel and permissions."  The full slide stated as follows:



33.    The statements referenced above in ¶32 were materially false and misleading when made for the same reasons stated in ¶31.

34.    Also on the earnings call, an analyst from Compass Point Research & Trading LLC asked defendant Cifu about ITG's mishandling of customer data.  That exchange went, in pertinent part, as follows:

**Christopher John Allen Compass Point Research & Trading, LLC, Research Division - Analyst**

Just wanted to ask, ITG's core brand has been as an independent agency broker. Obviously, Virtu is a market maker, a little bit different business.  And just how do

you kind of reconcile potential customer dis-synergies? What's the level of customer overlap? The onetime ITG has gotten in trouble with its customers, obviously, was the project, the Omega issue, where it was kind of hooking in to market making and arguably damage its brands were digging out from there. So just trying to think about how you guys are thinking about potential revenue dis-synergies moving forward. I know you guys have talked about the percent of revenues synergies. But I think the assumption out there for the market, is there going to be at decent level of revenue dis-synergies?

**Douglas A. Cifu Virtu Financial, Inc. - CEO & Director**

Yes, absolutely. It's a great question. Obviously, we are cognizant of it, and we have great respect for ITG brand as an independent and we're obviously very aware of the foot fault or more that they had in 2015. I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients. That's really ultimately what the issue is. And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with. And so obviously, the universe is going to know and clients will know that we are a very significant prop and retail market making firm, and we always will be. We have been in this business, the institutional business, since 2015 on a legacy Virtu basis. When we acquired Knight in 2017, they had been in business for over 20 years. So this is not a new phenomena. It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well. They've got prop market making. They've got customers and whatnot. And so there are mechanisms in place to make that happen. I would argue this actually makes the offering that much better for a couple of reasons.

First is, the same scale technology and understanding of market structure and indeed access to the markets that we use for our market making business is the same basic core DNA, which has to be cutting edge, which has to be updated, hourly and daily and weekly, that we use for our market making business, because if it's not acute and at the tip of the spear, it doesn't make money. We are going to use and we have been using that same infrastructure, that same market structure, that same understanding of how to route orders for our customers. So customers win in this scenario because you now have a firm that is in the market, that does have low latency financial technology. Everything that everyone complains about, use Virtu, you get all those tools. that's the first thing. The second thing candidly is, as I said in my remarks, we're the only firm in the world that I'm aware of that has -- certainly in the United States, that has this unique combination of retail and prop liquidity. And we have been and we will continue to make that unique liquidity available to our customer base, which will expand here. And so overall, this is a win-win. It's all about transparency. It's all about being upfront with the customers, Chris. Is there overlap? Sure there is, but it's not as significant as one would think. We're happy to go through that separately. Obviously, we try to cover the same customers that ITG does, but there's really not a significant overlap. So we modeled $10 million of synergies, which is around 4%, 5% of their institutional business. In the Knight

transaction, we had assumed something similar what happened as well and we experienced 0 attrition on the institutional side. So I'm aware that customers will be concerned. I will do my best to be out there and to be transparent and talk to customers as will our entire institutional team. I think ultimately customers will see the value proposition of having a firm like Virtu and its skill set, married with a great firm like ITG.

35.    The statements referenced above in ¶34 were materially false and misleading when made for the same reasons stated in ¶31.

36.    The next day, November 8, 2018, Virtu filed with the SEC its Form 10-Q reporting on the quarter ended September 30, 2018, signed by defendants Cifu and Molluso.  In the Management's Discussion and Analysis ("MD&A") section, the 10-Q stated that certain factors, including "Risk Factors" described therein and in Virtu's annual report on Form 10-K, "could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements."  These factors included, among others, Virtu's "failure to maintain system security or otherwise maintain confidential and proprietary information[.]"

37.    The statement referenced above in ¶36 was materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)    that detailed confidential trading information from Virtu's Execution Services customers was accessible to essentially everyone at the Company via a widely known and regularly shared generic username and password, including to proprietary traders, who could abuse and benefit from that information;

(b)    that Virtu was unable to monitor which of its employees accessed the FS Database, or what information was viewed; and

(c)     that, as a result, Virtu had already failed to maintain its customers' confidential and proprietary information.

38.     On November 14, 2018, Bloomberg published an article titled "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover[.]"  The article discussed how Virtu's acquisition of ITG "caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning trades before they do." The article continued as follows:

> Virtu denies it'll do that and says it will erect barriers to keep those businesses separate and assuage critics' concerns.  The security regime will be overseen by a client-data governance committee made up of representatives from investment firms, Virtu Chief Executive Officer Doug Cifu said in an interview this week.
>
> "We're going to empower folks on the buy side -- our clients -- to assist us in how we design and implement these barriers," he said, declining to name potential members.  "If you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have."
>
> Virtu's proprietary traders -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said.  Software will block proprietary traders from viewing client data.  An outside auditor will vet the safeguards.  And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like biometric scanners or facial-recognition software for unlocking doors.
>
> "If that's what people want us to do, that's what we'll do," he said.

39.     The statements referenced above in ¶38 were materially false and misleading when made for the same reasons stated in ¶31.

40.     Also on November 14, 2018, Business Insider published an article titled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties[.]"  The article noted that the acquisition of ITG caused market observers to "worr[y] about Virtu's stock trading business – which trades the firm's capital – peeking into its new broker-dealer business and using that information to trade against clients."

41.     The article continued, "Its an issue that's important to CEO Doug Cifu [who] said in an interview that the firm is building a committee of global clients to oversee the firm to ensure that data is protected."  The article quoted defendant Cifu as follows:

> Our first order of business is to take the great ITG products, Analytics, Workflow Technology, and Commission Management Aggregation products and invest in them, and of course, we're going to enhance safeguards and transparency around the protection of client data.

> I can't overstate how important it is to me personally that client information is properly protected and, to that end, we're talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers.  It's still early and we are engaging the buy-side, getting their input, but the idea is that clients would oversee the management of their data and be empowered to recommend and engage an outside auditing firm and the meetings will be open to the all clients.

> The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency.  This is a good thing – no other firm gives this much transparency to its clients into how their information is protected.

42.     The statements referenced above in ¶41 were materially false and misleading when made for the same reasons stated in ¶31.

43.     On December 5, 2018, defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs US Financial Services Conference.  During the conference, they were asked about the concerns in the market about Virtu's acquisition of ITG.  That exchange went, in pertinent part, as follows:

**Alexander Blostein Goldman Sachs Group Inc., Research Division - Lead Capital Markets Analyst**

On the -- that was helpful by the way.  On the other end of the ledger, there is, obviously, some concerns in the market around revenue synergies and really, coming from a couple of places, either it's marrying a Market Maker with a dark pool operator.  Or having a Market Maker run just a product that will contain a lot of valuated information before it.  So what's been response from clients so far, so the customers of ITG, that [focus] your deal and how do you manage these?

**Douglas A. Cifu Virtu Financial, Inc. - CEO & Director**

Sure. I mean, they are all real concerns, right? And so we don't marginalize any of them. We address them right at front. On the dark pool side, that I'm very unconcerned about because today, we run a dark pool called Match it, all right. And a lot of brokers, like Goldman Sachs, run a dark pool, right? And also have Market Making, right? So I think the buy side is very comfortable with that. That is really not a concern, it's -- candidly nobody has raised that with me as an issue. I saw it in your report, but I'm happy to talk to whoever told you that, but no one has raised that with me. I think the larger concern is, hey, ITG has historically been a valued analytics provider, right? I don't want you to send to Virtu, which is a prop Market Making firm[, m]y end of the day trade file because somehow they are going to reverse engineer what I'm doing. What -- I've had proactively a dozen conversations with the large influencers and the 800-pound gorillas, if you will, on the buy side. And we, obviously, cooperated with a couple of articles, if you Google around, to Bloomberg, and we had some ideas about creating a buy side governance panel, which people really liked. And we've educated the sales force at ITG to say, listen: one, we're never going to do that; two, there's going to be contractual restrictions against that; three, there's going to be physical and virtual barriers, so prop folks can't get into it; and four, at the end of the day, we run a very small firm where everybody knows what's going on, in particular myself, it's maybe one of the old Wall Street partnership types of places. Not going to happen, not going to happen. Why would we do that?

44.     The statements referenced above in ¶43 were materially false and misleading when made for the same reasons stated in ¶31.

45.     On January 25, 2019, Virtu issued a press release, filed with the SEC on Form 8-K, about the ongoing acquisition of ITG. The update stated that "[p]ost-closing, Virtu intends to continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data[.]"

46.     The statements referenced above in ¶45 were materially false and misleading when made for the same reasons stated in ¶31.

47.     On February 7, 2019, Virtu held its 4Q2018 earnings call. In his prepared remarks, defendant Cifu stated, in pertinent part, as follows:

As has -- as had been reported, we have begun working with clients around processes and procedures to -- we intend to extend and buttress pertaining to Triton [an ITG

product], commission management, analytics, to ensure the integrity of client information.

48.     The statements referenced above in ¶47 were materially false and misleading when made for the same reasons stated in ¶31.

49.     In the question-and-answer session of the call, defendant Cifu was asked about the concerns in the market regarding Virtu's acquisition of ITG.  That exchange went, in pertinent part, as follows:

**Richard Henry Repetto Sandler O'Neill + Partners, L.P., Research Division - Principal of Equity Research**

So I've already gotten an e-mail saying that -- it sounds like that you're more bullish on the ITG acquisition.  And I guess the question is, we've talked to clients, we know you've been out, as you said in the prepared remarks.  I was talking to clients and just some feedback and why the feedback we've gotten has been incrementally positive?  And how are you getting people over -- or getting to that more positive view?  A couple of people that we talked to certainly were more positive after they talked with you.  If you could expound on that?

**Douglas A. Cifu Virtu Financial, Inc. - CEO & Director**

Sure.  Yes.  Thank you, and good morning, Rich.  Yes, I think it's really two elements to that.  The first is, you're right.  We've been out there, we've talked to dozens and dozens of ITG customers, both here in Canada and in Europe, and I think this is obviously the initial concern around we're adding an additional conflict because ITG, historically has been an agency business.  And we're -- we get that, we are very sensitive to that, and we're very direct and transparent about that. I think they like the transparency and the directness of Virtu.  We have no other way of conducting business.  There's no gray area at Virtu.  It's all black-and-white, and so we've been very upfront about how we will physically and virtually separate the businesses to ensure that we are good stewards of customer information, all the things you would expect that we do, and I think customers are encouraged to hear those words.

50.     The statements referenced above in ¶49 were materially false and misleading when made for the same reasons stated in ¶31.

51.     On or about March 1, 2019, Virtu posted on its website a letter from defendant Cifu to Virtu's clients, announcing the completion of the ITG acquisition.  The letter stated, in pertinent part, as follows:

> Prior to merging, both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data.  As we integrate, we will draw on the best practices of our combined company to continue to ensure that our policies, procedures and tools remain designed to safeguard confidential client information.  These safeguards will include physical and logical separations, where appropriate, between businesses and access control procedures.

52.     The statements referenced above in ¶51 were materially false and misleading when made for the same reasons stated in ¶31.

53.     On March 1, 2019, Virtu issued a press release, filed with the SEC on Form 8-K, announcing the completion of the ITG acquisition.  The announcement stated in pertinent part:

> "Over the past four months, the dedicated leadership teams of both firms have developed a detailed integration plan.  In the coming days we will begin to execute that plan to bring Virtu's leading technology, risk management and operational efficiency to ITG's array of agency solutions to better serve a global client franchise.  We are excited to welcome our new colleagues to execute and deliver on this plan," said Douglas Cifu, Virtu Financial, Inc. Chief Executive Officer.  Mr. Cifu continued, "ITG has a long history of providing clients with superior service and value-added products.  We look forward to creating the premier technology-enabled market making and execution services franchise."
>
> Upon completion of this acquisition, Virtu will implement a Client Information Security Program ("CISP") with respect to its broker-neutral client offerings (including, but not limited to, Analytics, Workflow Technology, and Commission Management).  As part of this program, Virtu will host Client Information Security Forums, through which the Company will provide information regarding the CISP's receive input from interested clients regarding their information security needs and discuss industry best practices and standards.

54.     The statements referenced above in ¶53 were materially false and misleading when made for the same reasons stated in ¶31.

- 16 -

55.     Also on March 1, 2019, Virtu filed with the SEC its Form 10-K for the year ending December 31, 2018, signed by defendants Cifu and Molluso (the "2018 Form 10-K"). In the MD&A section, the 2018 Form 10-K purported to caution investors against placing undue reliance on forward-looking statements because actual results could differ for a number of reasons, including the "failure to protect confidential and proprietary information[.]"

56.     The statements referenced above in ¶55 were materially false and misleading when made for the same reasons stated in ¶37.

57.     In the "Risk Factors" section, the 2018 Form 10-K discussed "unauthorized access to and misappropriation of information or data," in pertinent part, as follows:

> Breaches of our cybersecurity measures or those of our third-party service providers could result in any of the following: unauthorized access to our systems; unauthorized access to and misappropriation of information or data, including confidential or proprietary information about ourselves, third parties with whom we do business or our proprietary systems; viruses, worms, spyware or other malware being placed in our systems and intellectual property; deletion or modification of client information; or a denial-of-service or other interruptions to our business operations. While we have not suffered a material breach of our cybersecurity, any actual or perceived breach of our cybersecurity could damage our reputation, expose us to a risk of loss or litigation and possible liability, require us to expend significant capital and other resources to alleviate problems caused by such breaches and otherwise have a material adverse effect on our business, financial condition, results of operations and cash flows.

58.     The statements referenced above in ¶57 were materially false and misleading when made for the same reasons stated in ¶37.

59.     On March 13, 2019, Virtu filed a Form 8-K with the SEC, which included as an exhibit a presentation Virtu stated it planned to use at the FIA International Futures Industry Conference on March 13, 2019. The following slide was part of that presentation deck:

60. The statements referenced above in ¶59 were materially false and misleading when made for the same reasons stated in ¶31.

61. On May 3, 2019, Virtu held its 1Q2019 earnings call.  In his prepared remarks, defendant Cifu stated, in pertinent part, as follows:

> Also, as you may recall, when the deal was announced, we promised to provide unparalleled transparency into how we protect client information.  I'm pleased to report that on April 9 and April 30, we held our first client information security forums in New York and London, respectively.  We had over 100 clients and prospective clients attend in person or participate via telephone and Webex.  These forums are one element of our continuous commitment to our clients, and we look forward to similar engagements in other regions.

62. The statements referenced above in ¶61 were materially false and misleading when made for the same reasons stated in ¶31.

63. On May 10, 2019, Virtu filed a form 10-Q for the quarter ended March 31, 2019, signed by defendants Cifu and Molluso.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

64.     The statements referenced above in ¶63 were materially false and misleading when made for the same reasons stated in ¶37.

65.     On June 5, 2019, defendant Cifu represented Virtu at the Sandler O'Neill Global Exchange and Brokerage Conference.  In response to a question about the opportunities Virtu saw in the ITG acquisition, defendant Cifu said as follows:

> …ITG is a business that's been around, I think it started like in 1987 out of Jefferies. I mean the guys that started it were absolute genius pioneers.  That's not me, right. These are your guys that saw something, electronification of these markets.  And the client base that we have that's showing up on the screen, I mean 75% of the largest asset management in the world are Virtu analytics customers.  Let that sink in for a second, right.  The 38 or so or more of the top 50 asset managers in the world give us their entire trade blotter at the end of the day so that we can run analytics on it. Think about the trust that you've built with the buy side if someone will do that. That is literally the secret sauce of all these large asset managers.  Having a client list like that is priceless, as the Visa commercial says.

66.     The statements referenced above in ¶65 were materially false and misleading when made for the same reasons stated in ¶31.

67.     Later in that conversation, in response to a question about potential "revenue dis-synergies" that could affect the ITG acquisition, defendant Cifu said:

> Yes, I mean we had guided towards $10 million of revenue dissynergies because people are running around with their hair on fire that like, all these analytics and Triton customers are going to turn us off. . . . And so we had guided to that number. On the last earnings call, and I'll repeat what I said, we're going to be within that number.  I mean there are certain customers that are doing a review of Virtu like we were a new broker and I'm totally fine with that, as they should.  There's a small handful of customers that can't get themselves comfortable because we're a "market-making" or HFT firm but it's really going to be ultimately de minimis.  The large asset managers and the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize we didn't buy ITG to steal customer information.  It's kind of preposterous and borderline insulting to suggest we would do that.  We would never do that.  So people are sticking with us, they're giving us the benefit of the doubt here.

68.     The statements referenced above in ¶67 were materially false and misleading when made for the same reasons stated in ¶31.

69.     On August 9, 2019, Virtu filed its Form 10-Q for the quarter ended June 30, 2019, signed by defendants Cifu and Molluso.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

70.     On November 8, 2019, Virtu filed its Form 10-Q for the quarter ended September 30, 2019, signed by defendants Cifu and Ioffe.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

71.     On February 11, 2020, defendants Cifu and Ioffe participated in Virtu's 4Q19 earnings call.  During the conference, as part of his prepared remarks, Cifu stated the following:

> In just 2.5 weeks, we'll mark the first anniversary of our transformative merger with ITG.  And we witnessed -- as we have witnessed over the last year, the transaction combined 2 highly complementary businesses and created incremental operating scale is allowing both our Market Making and Execution Services segments to continue investing in our offerings.  While we remain open to strategic inorganic growth opportunities, we have successfully invested and launched a number of organic growth initiatives in the first year at little, if any, incremental cost. Each new offering of products that we deliver across our unified global technology platform adds to our scale, further strengthening our sustainable, competitive advantages as well as our client relationships.  The organic and inorganic initiatives we launched in 2019 have enhanced our operating leverage and increased the total addressable market of both of our operating segments. As discussed in prior calls, these and other initiatives are in line with our strategic vision to utilize our unified technology platform to deliver more products, services and data to more markets and clients as we grow our recurring revenues. As we remain focused on helping our clients meet their trading goals, we will naturally continue to uncover opportunities to strengthen these relationships by offering competitive, transparent and sustainable technology-led solutions.

72.     The statements referenced above in ¶71 were materially false and misleading when made for the same reasons stated in ¶31.

73.     On February 28, 2020, Virtu filed its Form 10-K for the year ended December 31, 2019, signed by defendants Cifu and Ioffe.  The 10-K included purported risk disclosures

substantially identical to those quoted in ¶¶55 and 57 above, which were materially false and misleading for the reasons explained in ¶37.

74.    On May 11, 2020, Virtu filed its Form 10-Q for the quarter ended March 31, 2020, signed by defendants Cifu and Ioffe.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

75.    On August 7, 2020, Virtu filed its Form 10-Q for the quarter ended June 30, 2020, signed by defendants Cifu and Ioffe.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

76.    On November 6, 2020, Virtu filed its Form 10-Q for the quarter ended September 30, 2020, signed by defendants Cifu and Galvin.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

77.    On February 25, 2021, Virtu filed its Form 10-K for the year ended December 31, 2020, signed by defendants Cifu and Galvin.  The 10-K included purported risk disclosures substantially identical to those quoted in ¶¶55 and 57 above, which were materially false and misleading for the reasons explained in ¶37.

78.    On March 9, 2021, in response to comments by The New York Times and CNBC anchor Andrew Ross Sorkin about market makers, defendant Cifu wrote the following tweet about Virtu's supposed lack of access to client data:



79. The statements referenced above in ¶78 were materially false and misleading when made for the same reasons stated in ¶31.

80. On May 7, 2021, Virtu filed its Form 10-Q for the quarter ended March 31, 2021, signed by defendants Cifu and Galvin. In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

81. On June 9, 2021, defendant Cifu was interviewed on CNBC. During the segment, defendant Cifu was asked about Virtu's use of customer information. That exchange went, in pertinent part, as follows:

**Bob Pisani – CNBC**

Another point that Chair Gensler was making is that this is commission free trading, but it's not cost free trading. That there is a cost that is taken out of this. The implication here, somehow, is that maybe you are exacting a toll, maybe you're stealing data from people in some way. Do you take data from people and use it? Do you have some kind of informational advantage? What really goes on here, what was Chair Gensler talking about?

**Doug Cifu – CEO, Virtu**

Yeah, I mean, to be candid, that one had me scratching my head a little bit, because I've heard that from critics of all different types, and frankly the opposite is true. The brokers from which we receive orders are world class organizations, multibillion dollar organizations, you know their names, they protect their client's information. We never see anything. There's zero client identification. We just get an order. Five thousand shares of Tesla, we want to buy it. It comes from a broker, we have no idea who the underlying client is, whether they sent that order today and five minutes later they are sending the same order or not, we have no clue. There is zero information. In fact, the market maker is at an informational disadvantage cause we're just sitting there two-sided all day across two hundred different brokers saying send us your orders, we have to take them. When they're market orders, we can't reject them, so the informational asymmetry is actually against the market maker. I really, really look forward to demonstrating that. The narrative somehow that we're Facebook and we have this information advantage is just categorically false.

82.    The statements referenced above in ¶81 were materially false and misleading when made for the same reasons stated in ¶31.

83.    On August 4, 2021, Virtu filed its Form 10-Q for the quarter ended June 30, 2021, signed by defendants Cifu and Galvin. In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

84.    On November 3, 2021, Virtu filed its Form 10-Q for the quarter ended September 30, 2021, signed by defendants Cifu and Galvin. In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

85.    On February 18, 2022, Virtu filed its Form 10-K for the year ended December 31, 2021, signed by defendants Cifu and Galvin. The 10-K included purported risk disclosures substantially identical to those quoted in ¶¶55 and 57 above, which were materially false and misleading for the reasons explained in ¶37.

86.     On May 3, 2022, Virtu filed its Form 10-Q for the quarter ended March 31, 2022, signed by defendants Cifu and Galvin.   In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

87.     On June 8, 2022, defendant Cifu represented Virtu at the Piper Sandler Global Exchange & Brokerage Conference.   During the conference, while commenting on potential regulatory changes by the SEC to rules underpinning the U.S. stock market, defendant Cifu stated, in pertinent part, as follows:

> This narrative somehow that like, oh, we just like hang around and like we are of the SIP against this, we front-run because there's information you noticed you didn't mention that today, right?  We talked about this information advantage that we used to have, it was complete bull****.  It was complete bull**** and I told him it was bull**** and they stopped talking about it, right? So a lot of the stuff that you hear, right, is not fact-based.  So let's have a fact-based conversation about it, and we'll see where this all comes out.

88.     The statements referenced above in ¶87 were materially false and misleading when made for the same reasons stated in ¶31.

89.     On August 2, 2022, Virtu filed its Form 10-Q for the quarter ended June 30, 2022, signed by defendants Cifu and Galvin.   In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

90.     On November 3, 2022, Virtu filed its Form 10-Q for the quarter ended September 30, 2022, signed by defendants Cifu and Galvin.  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

91.     On February 17, 2023, Virtu filed its Form 10-K for the year ended December 31, 2022, signed by defendants Cifu and Galvin (the "2022 Form 10-K").  The 10-K included purported

risk disclosures substantially identical to those quoted in ¶¶55 and 57 above, which were materially false and misleading for the reasons explained in ¶37.

92.     Also in the 2022 Form 10-K, Virtu revealed that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

93.     On this news, the price of Virtu Class A common stock declined $0.33 per share, or 1.6%, from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

94.     On April 28, 2023, Virtu filed its Form 10-Q for the quarter ended March 31, 2023, signed by defendants Cifu and Galvin (the "Q1 2023 10-Q").  In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

95.     In the Q1 2023 10-Q, Virtu also reiterated that it had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further disclosed, in relevant part, "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

96.     On this news, the price of Virtu Class A common stock fell $2.91 per share, or 14.5%, over the course of several days from its closing price on April 28, 2023 of $20.05 per share,

to close at $17.14 per share on May 3, 2023. Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

97.     On July 28, 2023, Virtu filed its Form 10-Q for the quarter ended June 30, 2023, signed by defendants Cifu and Galvin (the "Q2 2023 10-Q"). In the MD&A section, the 10-Q contained the same purported risk disclosure quoted in ¶36 above, which was materially false and misleading for the reasons explained in ¶37.

98.     Also in the Q2 2023 10-Q, Virtu disclosed that "[t]he Company and its subsidiaries are subject to several [] matters at the present time, including, among others, a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's internal information access barriers. The Company has continued to cooperate with this civil investigation and engaged in settlement discussions. The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded. The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

99.     On this news, Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023. Defendants, however, failed to disclose the full extent of their fraud, resulting in the price of Virtu Class A common stock remaining artificially inflated.

100.    On September 12, 2023, the SEC issued a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information."  The press release continued, in pertinent part, as follows:

> As alleged in the SEC's complaint, Virtu Americas and its affiliates operated two businesses that it purported to have walled off from each other: an order execution service for large institutional customers, whereby Virtu Americas executed customer orders, typically for a commission, and a proprietary trading business, through which Virtu Americas bought and sold securities for its own accounts and benefit. From approximately January 2018 through the beginning of April 2019, however, Virtu Americas allegedly failed to safeguard a database that contained all post-trade information generated from customer orders routed to, and executed by, Virtu Americas, including customer identifying information and other material nonpublic information.  The SEC's complaint alleges that this database was accessible to practically anyone at Virtu Americas and its affiliates, including their proprietary traders, through two sets of widely known and frequently shared generic usernames and passwords.  Virtu Americas' failure to safeguard this information created significant risk that its proprietary traders could misuse it or share it outside Virtu Americas. For example, a Virtu Americas proprietary trader allegedly could observe that Virtu Americas had executed the orders of a large institutional customer throughout the day, understand that the same customer may follow a similar trading pattern over the next days, and take advantage of such information by trading ahead of the customer's subsequent orders.
>
> Nonetheless, during this fifteen-month period when Virtu Americas failed to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of that information, Virtu misled customers about the existence and adequacy of such information barriers.  As alleged in the SEC's complaint, in some instances Virtu overstated the controls, barriers and processes it had in place to secure its institutional customers' post-execution trade data, and in others falsely represented to those customers that only employees with a need to see such information – a group that did not include proprietary traders – could do so. Following these false and misleading statements, a number of institutional customers continued to use Virtu Americas to execute their orders, resulting in significant commissions for Virtu Americas.

101.    In response to this news, Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

102. As a result of these revelations, the price of Virtu Class A common stock ultimately declined to a low of just over $17 per share, more than *54%* below the Class Period high, causing Plaintiff and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

103. In addition, throughout the Class Period, Virtu's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose that Virtu was not adequately protecting confidential client information violated Item 303 because these activities represented events and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

104. Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Virtu] speculative or risky" and an explanation of "how [the] risk affecte[d] [Virtu]." Defendants violated Item 105, because these adverse facts described herein created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Virtu speculative or risky.

105. Based on these requirements, the MD&A in the Forms 10-K and 10-Q that Virtu filed with the SEC during the Class Period was materially false and misleading when made because Defendants, in violation of SEC rules and regulations, failed to disclose the risks, events, and uncertainties then known to management, including the conduct that subjected Virtu to contingent

liabilities, including fines, reputational damage, civil and/or criminal penalties, and/or other sanctions, that were reasonably likely to have a material adverse effect on Virtu's operating results.

## ADDITIONAL SCIENTER ALLEGATIONS

106. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Virtu, their control over, and/or receipt and/or modification of Virtu's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Virtu, were active and culpable participants in the fraudulent scheme alleged herein.

107. Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

108. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and final condition, as alleged herein.

109.    The Individual Defendants, because of their positions with Virtu, controlled the content of the Company's public statements during the Class Period.  The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Virtu's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.  At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations.  To the extent they were lacking such a basis, they are likewise responsible and liable for the misrepresentations contained therein.

110.    The Individual Defendants, as executive officers of Virtu, at a minimum, should have been aware of key facts related to the Company's operations, including its purported protection of confidential client information through information access barriers.  For example, defendant Cifu is a former partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP, who readily admits to being aware of "***compliance with the mandates of the Securities Exchange Act***."  Indeed, on the first day of the Class Period, Cifu acknowledged that "***[i]n my prior life, I was a lawyer, so I've read the statute***."  As such, Cifu and the other Individual Defendants were aware of the importance of safeguarding confidential client information at Virtu.

111.    In drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations, the Individual Defendants were either

already knowledgeable, became knowledgeable, or recklessly disregarded the underlying facts regarding Virtu's failure to protect confidential trading information from Virtu's Execution Services customers, including that essentially anyone at Virtu – including its proprietary traders – had unfettered access to such customers' material non-public information.

## LOSS CAUSATION/ECONOMIC LOSS

112. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Virtu Class A common stock and operated as a fraud or deceit on Class Period purchasers of Virtu Class A common stock by misrepresenting the value of the Company's business and prospects in the Company's operations.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein.  As a result of their purchases of Virtu Class A common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

113. On February 17, 2023, Virtu revealed that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

114. On this news, the price of Virtu Class A common stock declined $0.33 per share, or 1.6%, from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

115.    On April 28, 2023, Virtu reiterated that it had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further disclosed, in relevant part, "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

116.    On this news, the price of Virtu Class A common stock fell $2.91 per share, or 14.5%, over the course of several days from its closing price on April 28, 2023 of $20.05 per share, to close at $17.14 per share on May 3, 2023.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

117.    Then, on July 28, 2023, Virtu disclosed that "[t]he Company and its subsidiaries are subject to several [] matters at the present time, including, among others, a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's internal information access barriers.  The Company has continued to cooperate with this civil investigation and engaged in settlement discussions.  The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded.  The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a

specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

118.    On this news, the price of Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.  Defendants, however, failed to disclose the full extent of their fraud, resulting in the price of Virtu Class A common stock remaining artificially inflated.

119.    Finally, on September 12, 2023, the SEC issued a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information."

120.    In response to this news, the price of Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

## NO SAFE HARBOR

121.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of the company making the statement who knew that those statements were false or misleading when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

122.    At all relevant times, the market for Virtu Class A common stock was an efficient market for the following reasons, among others:

(a)    Virtu stock met the requirements for listing, and its Class A common stock was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    according to the Company's 2022 Form 10-K for the fiscal year ended December 31, 2022, Virtu had over 97 million shares of its Class A common stock outstanding as of February 17, 2023;

(c)    as a regulated issuer, Virtu filed periodic public reports with the SEC;

(d)    Virtu regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and unexpected material news about Virtu was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

123.    As a result of the foregoing, the market for Virtu Class A common stock promptly digested current information regarding Virtu from publicly available sources and reflected such information in the price of Virtu Class A common stock.  Under these circumstances, all purchasers of Virtu Class A common stock during the Class Period suffered similar injury through their purchases of Virtu Class A common stock at artificially inflated prices, and a presumption of reliance applies.

124.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Virtu's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Virtu Class A common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

126.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Virtu Class A common stock actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Virtu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

127.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

129.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented and/or omitted material facts about the business and operations of Virtu; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

131.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132.    During the Class Period, defendants disseminated or approved the statements specified above, which they knew, or deliberately disregarded, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Virtu Class A common stock during the Class Period.

134.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Virtu Class A common stock.  Plaintiff and the Class would not have purchased Virtu Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

135.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.    The Individual Defendants, and/or persons under their control, violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury

- 37 -

to Plaintiff and the other members of the Class. By virtue of their positions as controlling persons, each of these defendants are each liable pursuant to §20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

137.    Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of, and contractual rights with, Virtu, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action is a proper Class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  October 31, 2023                        ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                SAMUEL H. RUDMAN
                                                DAVID A. ROSENFELD
                                                MARIO ALBA JR.
                                                ROBERT D. GERSON

                                                        */s/ Robert D. Gerson*
                                                ROBERT D. GERSON

                                                58 South Service Road, Suite 200
                                                Melville, NY  11747
                                                Telephone:  631/367-7100
                                                631/367-1173 (fax)
                                                srudman@rgrdlaw.com
                                                drosenfeld@rgrdlaw.com
                                                malba@rgrdlaw.com
                                                rgerson@rgrdlaw.com

                                                *Attorneys for Plaintiff*

- 39 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

City of Birmingham Retirement and Relief System ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Marechal v. Acadia Pharmaceuticals Inc.*, No. 3:21-cv-00762 (S.D. Cal.)
*Parot v. Clarivate plc*, No. 1:22-cv-00394 (E.D.N.Y.)
*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, No. 1:22-cv-06339 (S.D.N.Y.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Hiebert v. Virtu Financial, Inc.*, No. 1:23-cv-03770 (E.D.N.Y.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of North Miami Beach Police Officers' and Firefighters' Retirement Plan v. Barclays PLC*, No. 1:22-cv-08172 (S.D.N.Y)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

VIRTU FINANCIAL

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this _30th_ day of _October_, 2023.

City of Birmingham Retirement and Relief System

By: _____
Jay P. Turner, Assistant City Attorney

- 2 -

VIRTU

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/26/2020 | 250 | $22.87 |
| 03/31/2021 | 42,238 | $31.13 |
| 02/08/2023 | 3,100 | $19.43 |
| 02/21/2023 | 3,100 | $19.90 |
| 03/06/2023 | 2,800 | $18.50 |
| 06/02/2023 | 1,500 | $18.19 |
| 06/12/2023 | 1,400 | $17.93 |
| 06/23/2023 | 1,600 | $17.79 |
| 07/10/2023 | 2,000 | $16.97 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 06/28/2019 | 100 | $21.78 |
| 07/12/2019 | 50 | $21.84 |
| 02/16/2021 | 100 | $29.13 |
| 06/25/2021 | 200 | $27.75 |
| 07/20/2021 | 1,220 | $25.95 |
| 09/09/2021 | 1,508 | $23.94 |
| 01/19/2022 | 2,693 | $29.51 |
| 04/19/2022 | 1,071 | $35.94 |
| 12/21/2022 | 3,323 | $20.63 |
| 03/15/2023 | 32,423 | $17.64 |
| 08/14/2023 | 1,100 | $18.84 |
| 08/29/2023 | 1,300 | $19.18 |
| 09/08/2023 | 1,200 | $18.32 |

Prices listed are rounded to two decimal places.

*Opening position of 200 shares.